Filed 12/9/14  Stephanie M. v. Super. Ct. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STEPHANIE M., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF STANISLAUS COUNTY, <br><br> Respondent; <br><br> STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Real Party in Interest. | F070157 <br><br> (Super. Ct. Nos. 516903, 516904) |
| AGUSTIN G., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF STANISLAUS COUNTY, <br><br> Respondent; <br><br> STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Real Party in Interest. | F070158 <br><br> (Super. Ct. Nos. 516903, 516904) <br><br> **OPINION** |

**THE COURT\***

ORIGINAL PROCEEDINGS; petition for extraordinary writ review. Ann Q. Ameral, Judge.

Thomas P. White, for Petitioner, Stephanie M.

Nadine Salim, for Petitioner, Agustin G.

No appearance for Respondent.

John P. Doering, County Counsel, and Maria Elena Ratliff, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

Petitioners, Stephanie M. (mother) and Agustin G. (father), seek an extraordinary writ (Cal. Rules of Court, rule 8.452) to vacate the orders of the juvenile court issued at a contested dispositional hearing denying them reunification and setting the case for a Welfare and Institutions Code section 366.26[1] hearing to terminate mother and father's parental rights to their daughter, A.G., and their son, V.G., both two years old. We deny the parents' petitions.

## PROCEDURAL AND FACTUAL BACKGROUND

### *Petition and Detention*

On November 20, 2013, a dependency petition was filed against mother and father pursuant to section 300, subdivision (b) for A.G. and V.G., then both 16 months old. There were five allegations setting forth the parents' conduct that placed the children in substantial risk of suffering serious physical harm or illness as a result of the parents' failure to supervise or protect the children adequately, their willful or negligent failure to supervise the children adequately, and their inability to provide regular care to the children due to mental illness or substance abuse.

---

\* Before Cornell, Acting P.J., Poochigian, J., and Detjen, J.
[1] Unless otherwise designated, all statutory references are to the Welfare and Institutions Code.

Allegation b-1 of the petition stated that on November 18, 2013, the Stanislaus County Community Services Agency (agency) received a referral from a police department in Stanislaus County that A.G. displayed the symptoms of a seizure, was unconscious, and was suffering a facial burn and a swollen vagina. Mother told investigators that she left the children in a bath alone while she went to get their clothes, V.G. had turned on the hot water and A.G.'s face was burned. Mother further reported that she had left the children in their walkers, A.G.'s walker tipped over, and mother found her on the ground and A.G. was not breathing. Medical personnel reported that A.G.'s injuries were not consistent with mother's story.

Allegation b-2 stated that social worker Christopher Lopez was informed by law enforcement investigators about A.G.'s injuries. A.G. was sent first to a local hospital, then to U.C. Davis Medical Center. Investigators were concerned that A.G.'s burns were caused not by hot water but by another liquid, and that her swollen vagina was potentially the result of penetration by a foreign object. Petechiae on A.G.'s chest and her severe head trauma were not likely to have been caused by falling over in a walker. Father was suspected to be under the influence of methamphetamine.

Allegation b-3 stated that Lopez interviewed father outside of the home on the day of the incident. Father said he lived with mother and the children and there was continuing domestic violence between the parents. Father left the home that morning after an argument with mother. Father said mother singled out A.G. to be mean to her. Mother would curse at A.G. and throw her in her crib for extended periods of time when both children were crying. Father noticed unexplained injuries to A.G. such as a missing tooth and marks on her head. Father stated that mother had mental health issues, was supposed to be taking medications, but was not taking them.

Allegation b-3 further stated that although father was aware of these problems, he continued to leave the children alone with mother and said he did not think he was responsible for the children while they were in mother's care. Father was further aware

3

of mother's continuing use of drugs. Father said he had been drinking that day and refused to submit to a drug and alcohol test. Father admitted drug use and engaging in domestic violence.

Allegation b-4 stated that Lopez questioned the paternal grandmother who stated that at times she cared for A.G. because mother did not properly care for her. The grandmother reported that A.G. was often dirty when she came from mother's care and she told father she is concerned with mother's care of the children.

Allegation b-5 stated that Lopez questioned mother on November 18, 2013. Mother said father left the home at 3:00 p.m. that day and did not return. Mother complained that father did not help with the children, only came home for sex, to use the restroom, eat, and sleep. Mother said she and father verbally argue in front of the children. Mother said of the children that they '"shit and piss everywhere."' Mother admitted that she did not regularly change the children's diapers and this caused a severe rash on her daughter. Mother acknowledged that she yelled at A.G., telling her things like, '"shut the fuck up."' Mother told Lopez the same story she told other investigators about leaving the children in the bathtub and later seeing steam rising from water V.G. had turned on, accidentally burning his sister. Mother said she called a health center and made an appointment for the next day for the blisters on A.G.'s face.

Allegation b-5 further stated mother stopped taking her prescription medication for depression and anxiety because she was, at that time, two months pregnant. Mother reiterated the walker story to Lopez. Mother told Lopez she was not using drugs but father was doing so. Mother voluntarily took a drug test and tested positive for methamphetamine. Mother denied using methamphetamine but admitted she smoked marijuana three weeks earlier. Mother stated that she had not completed any services after an earlier family maintenance action had closed. Mother admitted she engaged in domestic violence in the presence of the children and this placed them at risk. Mother

4

admitted that one day she left the children unattended twice, and each time A.G. was injured.

On November 21, 2013, the juvenile court ordered the detention of both children finding a prima facie showing from the allegations in the petition. The parents were appointed counsel and granted visitation with the children.

*Jurisdiction Hearing*

A jurisdiction/disposition report was filed on January 10, 2014. In July 2012, mother gave birth to the children prematurely. It was reported mother tested positive for methamphetamine at birth and admitted using methamphetamine the day before delivery. Father also had a history of abusing methamphetamine. The allegation of general neglect was substantiated and the parents were placed on voluntary maintenance services. A referral was made to the agency in December 2012 based on a physical fight between the parents. Criminal charges were brought against father and the social worker involved with family maintenance services was advised of the incident. The parents were again involved in domestic violence in February 2013. An allegation of general neglect was substantiated.

Mother reported to her social worker that she was diagnosed with PTSD, depression, and anxiety. Although mother was treated for these issues, she slowly drifted away from her treatment and recently stopped. Mother said she began using drugs at 18 years old, when she started using crystal methamphetamine. Mother was married for a few years to another man, but divorced him in 2011. Mother was in regular contact with a child born of that relationship until she started to struggle with substance abuse.

Father reported he first began using methamphetamine when he was 15 years old. Father uses methamphetamine and alcohol. Mother stated she needed help with substance abuse, parenting skills, and mental health. Father believed he needed help with substance abuse, parenting skills, and domestic violence treatment. A.G. appeared to be

5

developmentally on target. V.G. appeared to be developmentally delayed and was being referred to a program.

The agency did not believe either child would be safe in the care of either parent. Both parents were attending inpatient substance abuse treatment programs. At the time the report was prepared in January 2014, no other services had been addressed yet. Mother was given referrals for AOD, a substance abuse assessment, parenting classes, a domestic violence program, and individual counseling.

Father was given referrals to AOD, a substance abuse assessment, parenting classes, and a domestic violence program. Father was admitted into the Nirvana Residential Treatment Program on December 9, 2013. By January 5, 2014, father was having difficulty in the program due to issues involving literacy. A plan was developed for father to work with a friend for extra assistance and the arrangement was reported to be working well. Father was disappointed that he could not finish the program as quickly as he wanted, but agreed the extra time would be beneficial and he remained in the program.

A.G. was hospitalized at U.C. Davis Medical Center with second degree burns to her face. On discharge, A.G. was placed in the foster family home that also cared for her brother. V.G. was very aggressive and deregulated to the point of having day and night terrors after visiting the parents. Mother and father visited the children four times after they were detained. Mother appeared to be overwhelmed and was unable to attend to them. Mother commented that the children wear her out. Father played with the children, attended to their needs, and was appropriate during visits.

Mother was in police custody from November 26, 2013, to December 12, 2013, was released, and went to the Nirvana Program. By December 31, 2013, mother was beginning to take responsibility for the injuries she caused A.G.

According to the social worker, mother was arrested and "resolved her criminal case."[2]  Father was taken into custody on a warrant, apparently unrelated to the incidents of November 18, 2013, but resolved the issue.  Initial concerns that A.G. was sexually abused were dispelled when it was determined that the likely cause of her vaginal swelling was diaper rash.  The social worker noted that although both parents had experienced difficulty in their programs, the social worker was optimistic that reunification with the children was very possible if they continued to progress.

The agency recommended the allegations of the petition be found true and the children be removed from their parents' custody.  The progress by the parents toward alleviating or mitigating the causes necessitating placement had been good, and the agency recommended reunification services be granted to both parents, and the court adopt the case plan.[3]

The jurisdiction/disposition hearing was held on January 29, 2014.  The reporter's transcript of the jurisdiction/disposition hearing was not made part of this record.  Mother submitted a waiver of her rights to a contested jurisdiction hearing and submitted the matter on the allegations in the petition and the social worker's reports.  The court found the allegations in the petition to be true by clear and convincing evidence and set the

---

[2]     The status review report filed for the review hearing on July 21, 2014, indicated that mother was "convicted of a felony indicating parental unfitness."  In a report containing additional information filed by the agency on August 1, 2014, prior to the review hearing, the details of mother's conviction were set forth as follows.  On December 11, 2013, mother pled no contest to one felony count of willfully inflicting unjustifiable physical pain or mental suffering on a child that mother had under her care and endangering the child's health in violation of Penal Code section 273a, subdivision (a). Mother also admitted an enhancement alleging that she caused her child, who was under five years old, great bodily injury in violation of Penal Code section 12022.7, subdivision (d).  Mother was placed on felony probation.

[3]     The case plan included drug testing for both parents.  Mother and father were to take domestic violence and parenting education programs.  Mother was to participate in general counseling and actively participate in mental health services, including a psychiatric/psychological evaluation.

matter for a six-month review hearing. The court found mother and father had made good progress in their reunification efforts. The court ordered services for both parents and adopted the proposed findings and orders in the social worker's report.

***Review Hearing Reports and Evaluations***

On July 11, 2014, the agency filed a status review report. Pamela Werb, the social worker assigned to this case, reported that mother began her domestic violence/anger management sessions on June 19, 2014. On May 5, 2014, Werb sent an email to mother's counsel, Mr. White, noting that mother had disclosed to Werb, Nirvana, Child Protective Services (CPS) supervisor Ms. Palasencia, and Camera Bonsack, an AOD specialist, that mother had intentionally harmed A.G. Mother later admitted that she was very angry at her daughter. Werb notified White that she was seeking a clinical assessment of mother. White replied on June 11, 2014, that mother agreed to do so and had no objection to a clinical assessment.

Maryanne Cose of Sierra Vista Child and Family Services (Sierra Vista) had one appointment with mother, and scheduled a tentative appointment for June 30, 2014, but mother could not make the appointment due to an issue with transportation. Three appointments were set for July 2014. Mother began to see Amy Coleman-Brisky to meet the individual counseling component of her case plan. Werb noted in an email on June 8, 2014, to a caregiver at Nirvana, that it was commendable for mother to admit how she hurt her daughter and Werb thought that it would be necessary for the parents to receive proper services for the children to be protected under the parents' care. Werb was concerned, however, that mother appeared to have no emotion and lacked expression when she told her story and those emotions displayed appeared to be forced.

Werb further observed that mother appeared to like the attention she was getting and was not able to share what she needed to do to change her behavior. Werb believed mother was trying to make or force a bond to happen with A.G. During a recent visit, father did nothing while mother tried to force a bond with A.G. Werb was concerned

about this because A.G. was crying for about 40 minutes during the visit. Neither parent could calm her and mother described her efforts as an attempt to bond with A.G. When Werb picked A.G. up, she immediately stopped crying.

Werb further expressed concerns about Coleman-Brisky's assessment that mother was doing great and praised mother for spending time on the floor with her children prior to giving birth. Coleman-Brisky seemed to minimize mother's forced attempt to bond with A.G. Werb received an email from Coleman-Brisky on July 8, 2014, that stated Coleman-Brisky had only met with mother a few times and noted a concern that mother was early in her services and has not had enough time to address her plan objectives. Coleman-Brisky could not speak to mother's progress, or lack of progress, in achieving her plan objectives.

Mother attended 10 out of 10 parenting education classes and completed her last class on June 12, 2014. Mother had been a resident of the Redwood Family Center since April 26, 2014. Mother was compliant with the requirements and guidelines of the program. Mother's last drug test was negative for all substances on June 12, 2014. Prior to her residency in the Redwood Family Center, mother was in the inpatient treatment program at Nirvana Residential Treatment from December 12, 2013, until she successfully completed the program on April 26, 2014. Mother was briefly discharged from the Nirvana program for negative and punitive behavior on February 13, 2014, and reentered the program on February 27, 2014. Mother did violate program rules on a number of occasions.

Mother showed awareness that her anger placed her at a higher risk for addiction. A caregiver in the Nirvana program expressed concern that mother was not taking prescribed medications for her mental health condition because she was pregnant and the absence of this treatment placed mother at a high risk for relapse.

On March 5, 2014, while in the Nirvana program, mother admitted that she caused A.G.'s injuries. On June 6, 2014, while in the Nirvana day treatment program, mother

9

said she was upset at not being able to bring her new baby home with her and blamed CPS. Mother said she regretted ever saying she hurt A.G. and said everything she admitted to was a lie and that she made the admissions only because CPS threatened to take her children from her for good if she failed to admit that she caused A.G.'s injuries. Mother went back to her original story to investigators that she merely failed to pay attention to her children while they were bathing and A.G. got her face too close to hot water. Later, mother blamed herself, not CPS, for what she had done. Mother was ashamed of being an abusive mother.

The Nirvana treatment staff noted on June 11, 2014, that mother took responsibility for being abusive. The Nirvana treatment staff noted that on June 27, 2014, mother had an outburst and continued to struggle with anger. Mother got upset during a group therapy session, said she was saying nothing because she might get a negative report sent to her social worker, angrily stomped out of the room, and slammed the door as she left.

During visitations, it was noted that father made better snack selections for the children than mother, although the children cried when father changed their diapers. Mother also placed the children in diapers that caused them allergies. Father attended all of his anger-management classes. Although father was slow to grasp the recovery process while in residential treatment, he completed all of his assigned work.

Father graduated from the inpatient treatment program in March 2014. Although father entered an outpatient program, and had a sponsor while in residential treatment, father never called his sponsor after leaving the inpatient program. By April 2014, however, father was seen as being open and honest about his addiction and was tremendously applying himself. Father regularly attended visitation with the children, but struggled while multitasking with all three children, including the newborn.

In July 2014, V.G. was still experiencing night terrors. Each of V.G.'s foster parents expressed concern that he experienced terrors in which he would wake up in the

middle of the night screaming. V.G. was difficult to console. Since moving to a new placement, V.G.'s night terrors were becoming less frequent. Both children were behind in language development, but were progressing.

Mother began her individual counseling with Coleman-Brisky on April 21, 2014. As of April 29, 2014, mother failed to obtain mental health services. Werb referred mother to Sierra Vista Child and Family Services at the agency's expense. Mother began her domestic violence/anger management program on June 19, 2014. Mother did not begin her clinical assessment until June 30, 2014.

Werb observed although mother was able to apply some feedback tools she had learned while visiting her children, and showed affection to her children, she appeared to visit her children with no real emotion or attachment. Mother showed no insight into what bonding meant and did not seem to understand that bonding could not be forced. During one visit, mother left V.G. on a changing table unsupervised while she attended her other children. When this was pointed out to mother, she became defensive and angry. Mother continued to struggle with angry outbursts.

Werb noted that early in his drug treatment, father was not taking his treatment seriously because he did not believe he had a problem. By March 2014, father's participation in group was low and he failed to see his sponsor after graduation from the inpatient program. In April 2014, father began taking his treatment more seriously, becoming honest about his addiction, completing his homework, and showing insight. Father was able to maintain his sobriety.

Father was present when mother attempted to force A.G. to bond with her. Father watched A.G. screaming, but failed to respond on A.G.'s behalf. Father's therapist was working with him to help father understand how to parent. Father, however, continued to yell at the children during visits and had not demonstrated any ability to keep the children safe from mother. After numerous conversations with father, Werb was not optimistic about his ability to keep the children safe from mother.

11

Werb believed the risk level for the children remained high. Mother continued to have angry outbursts after seven months of services and failed to take full responsibility for her actions. Mother further lacked the insight to protect her children. Werb was not optimistic that if given additional months of services, mother would show improvement. Werb was also concerned that though father did not abuse the children, he appeared to be unaware that mother was abusing A.G. even though he saw mother curse at A.G., be mean to her, and throw her in the crib. Father saw bruises on A.G.'s head, but still failed to protect her. Werb was not optimistic that given more time on his case plan, father would become protective of the children. Father and mother intended to remain a couple.

Werb concluded that mother had been slow to engage in services even though she had been given all necessary referrals in November 2013. Mother remained sober, but failed to make progress in other areas of her case plan. Given the very young age of the children, Werb believed reunification should be limited to six months unless the parents could demonstrate enough progress that it was certain the children would be returned to the parents within the next six months. Father failed to demonstrate that he could protect the children from mother. Werb recommended that reunification services be terminated for both parents.

Marriage and family therapist (MFT) Maryanne Cose with Sierra Vista, conducted a psychological examination of mother on August 19, 2014. Explaining how A.G.'s face was burned, mother reverted to the story she originally told investigators that A.G.'s face was burned because mother had left her unattended in the tub with her brother. Mother told Cose she did not take A.G. to the doctor out of fear because she recently had a child welfare case. Mother put Neosporin on A.G.'s face and placed A.G. in front of a fan to cool her off. Mother tried to peel off the edges of the burn, but this only made the condition worse.

Mother explained that she tried to set boundaries for the children, but the paternal grandparents would spoil A.G. This caused mother to yell at A.G. Mother said that the

rash on A.G.'s vagina was diaper rash but denied physical abuse. Mother had taken Zoloft in the past and was currently prescribed Paxil by her doctor. Mother identified alcohol, methamphetamine, and marijuana as her drugs of choice. Mother began drinking alcohol when she was 17 years old, but stopped drinking in November 2013. Mother began using methamphetamine when she was 21 years old and last used it on November 18, 2013. Mother began using marijuana when she was 16 years old.

Cose's diagnostic impression was that mother possibly suffered from intermittent explosive disorder. Mother suffered from Polysubstance-related disorder, anxiety disorder, depressive disorder, and that she had been the victim of physical and sexual abuse as a child. Cose believed mother lacked parental guidance. When discussing the upcoming court date, mother appeared to be detached. Mother displayed no emotion. Cose noted this could be a result of trauma mother experienced in her past, or, it could also be a reflection on mother's ability to attach with her children in a healthy manner.

Cose observed that mother seemed to be making an effort to learn new coping skills for her depression and anxiety. Mother said she felt counseling was beneficial, though she acknowledged she continued to have outbursts of frustration and anger. Mother admitted she used manipulation when she felt threatened or in trouble. Cose thought this was the result of mother's drug use or learned traits from her own mother. Cose noted there continued to be discrepancies in mother's account of the events surrounding A.G.'s injuries and the court report of events. Although mother told Cose the incident with A.G. as an accident, mother admitted a felony charge of willful cruelty to a child.

Due to the inconsistency in mother's account of events, questions Cose had concerning the possibility of manipulative behavior, and the nature and severity of A.G.'s injuries, Cose questioned the information provided by mother during the evaluation. Although mother had drug abuse and mental health issues, it was unclear whether mother's emotional outbursts were the result of those issues or poor impulse control.

13

Cose recommended further mental health evaluation and treatment for mother, as well as continued parenting classes and counseling.

*Six-Month Review Hearing*

The review hearing began on August 26, 2014, nine months after the children were detained.[4] The hearing took place over seven non-contiguous sessions, concluding on September 17, 2014. Judi Schardijn, an MFT with Sierra Vista, taught a domestic violence batterers class for women. Mother began attending the classes on June 19, 2014 and attended nine out of nine classes with one excused absence for a court appearance. The program is 52 weeks in duration. Schardijn's risk assessment for mother was that she was at a high risk because she had only attended nine classes. Mother had admitted being physically abusive to father.

Maryanne Cose, the M.F.T. who evaluated mother, testified that mother failed to disclose all of her current anger issues. Mother did not disclose her problems with anger management as it related to her own childhood trauma. Mother also did not reveal physical abuse that she directed toward father. Cose contacted mother's counselor from the Redwoods Sober Living Facility and learned that mother turned in a false meeting slip for a meeting at Redwoods on August 21, 2014.[5]

Kathy Gentry worked as the director of the women's program at Nirvana Drug and Alcohol Institute. She was formerly the director of the Nirvana Day Treatment program. Father was Gentry's client in the day treatment program. Father completed the inpatient program, but returned to it because he was not forthcoming concerning what happened in the incident with A.G. Father was not opening up in groups, minimized problems, and

---

**4** There was also a disposition hearing for the parents' infant child. The court ordered further reunification services for the parents for this child. The juvenile court's ruling on the disposition hearing for that child is not subject to this writ proceeding.

**5** The meeting was apparently an NA/AA meeting. Mother copied a peer's meeting slip. Mother testified that she forged the meeting slip because she lost the original and did not want to look as though she was failing to comply with her services.

14

failed to progress in his understanding of boundaries and communication. Father did make progress with these issues when he returned to the day treatment program. Father completed the inpatient program and was in the outpatient program working on issues of co-dependency and self-esteem.

Father never talked about the burning incident with A.G. or expressed that she was intentionally injured by mother. Father never expressed that he believed mother was not safe around the children because of what mother did to A.G. Father never said to Gentry that he would remove the children from a dangerous situation.

Gentry believed mother had gained insight into the issues involving her addiction. Gentry stated that mother had taken full responsibility for her actions in the incident involving A.G. Gentry, however, explained that mother never told Gentry that she intentionally burned A.G.'s face with a shower nozzle or that mother threw A.G. in her crib. Gentry conceded it caused her concern that mother falsified a meeting slip because honesty is necessary for life-long recovery and issues with honesty could lead to relapse.

During day treatment, mother had incidents involving angry outbursts including yelling at staff, standing up and pushing furniture away, and posturing. In Gentry's experience, mother had a modus operandi of getting upset, having an outburst, needing time to cool down, and coming back later to apologize.

Robert Thompson knew father through the Nirvana program and was a program director of the men's treatment facility. Father had no dirty drug tests. Nirvana could assist father with co-dependency issues. Father had improved his insight into co-dependency, but could definitely use additional improvement. Father never reported domestic violence between him and mother and never reported being fearful for his children because of safety issues surrounding mother's ability to parent.

Father's current alcohol counselor, Steve Leonard, testified that father was working on a relapse prevention program. Father told Leonard that he had a support system and a sponsor. Father is in compliance with his outpatient program and was

15

attending his meetings. Father was on step one of the 12-step program, did not have a completion date for the outpatient program, and was working on a transition to independent living.

Father told Leonard that because father left the home as part of his addiction, mother abused A.G., but he did not express additional concerns surrounding the intentional injuries inflicted on A.G. Father never discussed domestic violence as it related to relapse. Leonard could not recall father's specific relapse plan or the specific steps he would need to take if "his significant other" relapsed.

Cherie Clark, a domestic violence and anger management counselor at Sierra Vista, conducted father's domestic violence class. Clark assessed father's "risk for further abuse and violence" as low. This was due in part to the fact that he was living in a separate facility than mother. Father had done well in class and was honest. Father, however, had not shared in class that he was a victim of domestic violence.

Kimberly Kluball was mother's substance abuse counselor at First Step Perinatal Treatment Program. Kluball observed mother in three group sessions and one individual therapy session. Kluball described mother's participation level as very high. Kluball stated if she had information that mother falsified a meeting slip, she would be concerned. Also, mother's honesty and consistency concerning why her children were in foster care were important to mother's overall recovery and maintenance of sobriety.

Father explained that he was not physically abusive toward mother, but acknowledged he was verbally abusive. Father testified that he understood he needed to protect his children from mother. When asked if he understood what he meant by his answer, father replied, "Not really." Father said that he understood he had to protect his children from mother but could not explain why he felt he needed to do so. When asked if he had any worries about the children being with mother, father replied that he did not know because he was not focused on mother but on his own problems, his own recovery,

and his children's safety. Father felt hurt that mother harmed their daughter and guilty for not being present.

Regarding the incident in which mother held A.G. for 40 minutes while A.G. was crying, father said he learned from his group meeting that he should have taken A.G. away from mother and let his daughter go wherever she wanted to. When asked if he learned about the care of his children from parenting classes, father wanted to refer to notes he had taken from the classes. Father acknowledged that he could not always look at his notes.

Father did not believe that mother intentionally burned A.G.'s face, left A.G. in her crib after doing so, or hit A.G. hard enough to leave bruises. Father remembered telling a social worker that he had seen bruises on A.G. Father did not know how A.G. became bruised because he was not at home. At that time, father was in his addiction and worried more about getting high than staying at home for his kids. Father had assistance writing a backup plan to protect his children that consisted of watching out for the children, protecting them, not leaving them in a dangerous situation, and taking the children away to a relative's home.

Father did not know how A.G. got burned and did not ask mother about the incident. When asked if he would like to know what happened, father responded that he would need to talk to a counselor "to deal with it, the emotions, and how to express [sic]." This was not something father had discussed with his counselor. Father said he wanted to have couples counseling with mother. Father said he had no problem with all the children together, even though they were different ages. Father said he acted like a little kid when he was with them and that was how he played with them.

Father believed a crying or screaming child would be acting that way too long if the child was doing so for 30 to 40 minutes. Father would not consider intervening before 20 minutes if he was with A.G. and she was crying. Father believed he could care for his children on a day-to-day basis. Father had joint custody of two children who are

17

older than A.G. and V.G. Before A.G. and V.G. were removed, the older children would visit him on the weekends.

When asked if father needed to protect the children from mother now, he replied, "I don't know for sure." Father explained that he did not intervene when mother was holding A.G. for 40 minutes and A.G. was crying because mother was "bonding" with A.G. According to father, holding a child is soothing and bonding with the child. Father did not know if A.G. was distressed while mother held her for 40 minutes. Father said that mother hit him during their addiction.

Sierra Vista clinician Amy Brisky was mother's therapist and parenting education instructor. Mother told Brisky about her addiction and leaving A.G. in the bathtub where hot water was directed at A.G.'s face while mother was adjusting the water temperature. Mother told Brisky the incident was an accident. Part of Brisky's therapy with mother was directed to mother's co-dependency issues with father. Brisky saw progress in mother's understanding of co-dependency because she was open to addressing topics.

Mother appeared to understand the parenting topics Brisky covered during their sessions. Mother did not act inappropriately during a parent-lab session involving parent-child interaction that lasted 45 to 50 minutes. Brisky could not answer a question concerning whether mother was accountable for A.G.'s injuries. Mother admitted being manipulative.

Mother told Brisky she had been pressured to say something she did not want to say concerning the injuries A.G. suffered. Mother told Brisky that if she did not say what the staff at Nirvana wanted her to say, mother would not have been readmitted into the program. Brisky was not sure if mother was being honest with her. Mother's case was assigned to Brisky on February 20, 2014. Mother had her first individual session with Brisky on April 21, 2014.

Brisky believed mother needed more time to meet her case objectives. Mother was still in the beginning stages of processing the topics which Brisky was assigned to

focus on with her. Mother still had a lot of work to do in Brisky's clinical opinion. Mother only brought her homework with her for Brisky to review on two out of seven sessions.

Social worker Pamela Werb testified that mother said she burned A.G. and also threw A.G. in the crib, hitting A.G.'s head and causing injury. Regarding the shower incident, mother said she acted out of anger. Mother told Werb that she left A.G. in her crib to cry and also that she hit A.G. and left bruises. Mother was having difficulty complying with the mental health component of her case plan. Werb referred mother to Golden Valley.

Werb was at her desk working during mother's visitation with her children when A.G. was crying. Werb was notified and walked from her desk to the visitation room. As Werb arrived, she could hear A.G. screaming from down the hallway. As soon as Werb picked A.G. up out of mother's arms, A.G. stopped screaming. Mother was holding A.G. with stiff arms and was not trying to rock her. Mother appeared to be uncomfortable.

Werb thought mother was attending the required services on her case plan. Werb distinguished, however, mother's participation in services from making progress in services. Although mother had remained clean and sober, she continued to struggle with dishonesty and anger after receiving services for nine months. Turning in a falsified meeting slip showed mother's dishonesty and caused Werb concern over whether mother could maintain her sobriety. Werb was further concerned over mother's inconsistent accounts of the bathtub incident. Werb believed that father not only failed to be protective, he did not know how to be protective.

Mother testified on her own behalf and admitted she had an anger issue. Mother disagreed with the recommendation to terminate reunification services because she had received therapy from Brisky and learned a lot from the programming at Nirvana. Mother's outburst on June 27, 2014, at Nirvana occurred a day after she was not allowed

to bring her newborn baby home. Mother had just finished step two of her 12-step program and was about to start step three.

Mother had a meeting at Nirvana on March 5, 2014, with Chris Plascencia, Camera Bonsack, and a woman named Liz from Holly Bock. Regarding the physical harm mother caused A.G., mother became honest and told the women she hurt A.G. but it was not her intent to hurt her and A.G. "got burnt by hot water" by a nozzle of water mother was holding. When asked about her state of mind as this happened, mother replied that she was under the influence of drugs. Mother testified that Plascencia and Bonsack told her that she would not get her children back if she said what actually happened to A.G.

Mother told Werb that it was not her intention to hurt her daughter and she was not angry when the incident happened. Several times in her testimony, mother denied any intent to burn A.G. When mother later reiterated this point, the court asked mother to explain her intention. Mother replied that she was high on drugs and had no intention. Mother was "frustrated with the situation" and had to take another child out of the bath. Mother explained she was not paying attention. Mother said she put A.G. in her crib for a time out because A.G. would cry for long periods of time and mother did not know what to do. Mother denied telling Werb that she hit A.G.'s head or that A.G. had bruises.

Mother stated that the burn was the only incident of physical abuse. Mother attributed the emotional abuse that she inflicted to her drug use. Mother believed she had made significant progress on her case plan. Mother admitted she had anger issues, but believed she showed empathy by placing herself in her daughter's shoes.

Mother admitted falsifying a meeting slip, but did not want to admit that she lost the original because she wanted to be perfect. Mother said she had a lot of problems with Werb and was afraid of her. Mother did not believe Werb treated her fairly. Mother was taking medication for her anxiety, but did not get a mental health assessment done sooner because she was pregnant and she did not have the money for the evaluation.

20

Mother believed she could handle all three children and would do her best to meet their daily needs. Mother did not know if she would reach out for support from her social worker if she needed it. Mother denied telling people at Nirvana that she burned A.G. because mother was angry. Mother admitted she intentionally did an act that caused A.G. to be burned, but did not intend to harm her.

Chris Plascencia was a family reunification supervisor for the agency and also acted as the liaison with Nirvana. During a meeting at Nirvana concerning mother's case, mother said, "'I did it.'" Mother explained to Plascencia that she took the shower nozzle off and pressed it against A.G.'s face. Mother did not describe the incident as an accident. Camera Bonsack, who also worked for the agency, heard mother say that she held a faucet to A.G.'s face. Mother said she was relieved to make the admission because she had blamed her son and she was the one who caused the injury.

Plascencia said mother further admitted that she slapped A.G. and yelled at her on various occasions. After burning A.G., mother said she placed the children in diapers, placed newspaper on the floor, and left the children in the room alone for seven hours. Plascencia did not coerce mother to obtain the disclosure. Mother later admitting hitting and slapping A.G.

The juvenile court made separate findings on the infant child's disposition hearing and on the older children's review hearing.[6] The court found that although both parents made good progress regarding their substance abuse treatment, the court had concerns about mother's anger issues, honesty, and her manipulation. The court found mother's testimony to be completely inconsistent. The court did not find mother's testimony to be credible or reliable because mother would admit one thing one day and retract it later.

---

[6] As to A.G. and V.G., the court stated its factual basis for its ruling was "pretty much the same reasons as to why [it found] there is a real risk to return [the infant child] to the care of the parents." We therefore incorporate the findings that the juvenile court made for the infant child into its ruling concerning A.G. and V.G.

The court found mother was not honest and that honesty was a cornerstone for her to be able to maintain sobriety.

The court determined that mother intentionally burned A.G., there were other incidents where mother physically abused A.G., and mother had failed to acknowledge the full extent of what she had done. The court did not believe mother was empathetic and she was not honest with service providers. The court found mother had anger impulse problems, anger management problems, and continued to be manipulative, which presented a danger to the children.

The court found that father had worked hard to maintain his sobriety, but the court was concerned with regard to father's ability to provide protective capacity. The court was concerned that father was aware of unexplained injuries to A.G. when the children were removed from the parents' custody, and to the present time father did not have knowledge that mother was responsible for the injuries. The court found father failed to show the ability to provide protective capacity for the children. The court noted this finding was corroborated by the father's inability to intervene when mother held A.G. as she was screaming and crying for some 40 minutes.

Turning more specifically to A.G. and V.G., the court found that returning either or both of the children to the parents would create a substantial risk of detriment to the children. The court was particularly concerned about the risk of returning A.G. to the parents' care. The court reiterated its finding that mother had not accepted responsibility for what she had done to A.G. and mother had intentionally injured A.G. The court further found that mother was not close to A.G. at the time mother burned A.G., and had not really bonded with A.G. The court observed that A.G. was afraid of mother and was not at all bonded with mother.

The court described father's reaction to the incident where mother held a crying and screaming A.G. for 40 minutes as father "sitting there like a deer in the headlights." The court found father did not know what to do and did not have a clue as to how to stand

22

up to mother. The court was further troubled by the fact that father testified at the hearing that he did not believe mother had harmed A.G. even though he saw weird bruises on his daughter and other obvious signs of abuse.

The court concluded father would not benefit from additional services given the fact that he did not believe mother did anything to their child. The court approved and adopted the recommendations of the agency. The court found the agency complied with the case plan and made reasonable efforts to return the children to a safe home. The court found mother and father's progress was fair and they had only made good progress with regard to substance abuse treatment.

The court found mother's anger management issues and manipulative behaviors had not been addressed. The court stated that father "had not demonstrated any capacity to protect these babies." The court concluded the parents had not made substantive progress regarding the components of their case plan and did not find a substantial probability that the children would be returned to their parents if additional services were provided for an additional period of time. The court ordered the termination of reunification services and set the matter for a hearing pursuant to section 266.26.

## DISCUSSION

*Issues*

Mother contends there was insufficient evidence that she failed to make substantial progress on her reunification plan, she did not admit to the social worker that she threw scalding water on her daughter's face, mother was denied due process, the juvenile court's reference to A.G. being scared of mother was improper, and the court failed to consider the substantial probability that the children would be returned to her custody within 12 months. Father contends there was substantial evidence that he made substantial progress and the agency failed to provide him with reasonable services.

23

*Standard of Review*

When a party to a dependency challenges the sufficiency of the evidence to support the juvenile court's orders, reviewing courts determine if there is substantial evidence – evidence that is reasonable, credible, and of solid value which supports the juvenile court's conclusions. In evaluating the sufficiency of the evidence, all conflicts and reasonable inferences in the evidence are resolved in favor of the prevailing party. Issues of fact and credibility are resolved by the trier of fact. The juvenile court's determination in dependency proceedings will not be disturbed unless it exceeds the bounds of reason. (*In re Savannah M*. (2005) 131 Cal.App.4th 1387, 1393; *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969 (*Elijah R*.).)

The appellate court does not reweigh the evidence. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319 (*Stephanie M*.).) The reviewing court does not substitute its own deductions for those made by the trier of fact. (*In re John V*. (1992) 5 Cal.App.4th 1201, 1212.)

The social services department is obligated to make a good faith effort to provide reasonable services to address the unique needs of each family. (*In re Monica C*. (1994) 31 Cal.App.4th 296, 306.) In almost all cases, however, it will be true that more services could have been provided and the services provided were imperfect. The standard is not whether the services were the best that might be provided in an ideal world, rather, it is whether the services were reasonable under the circumstances. (*Elijah R*., *supra*, 66 Cal.App.4th at p. 969, citing *In re Misako R*. (1991) 2 Cal.App.4th 538, 547 (*Misako R*.).)

*Substantial Evidence of Progress*

Both parents contend there was substantial evidence they each made substantial progress in their services and the juvenile court erred in finding they had not done so. We conclude that the juvenile court's ruling that the parents failed to progress in their case plans is supported by substantial evidence.

The juvenile court found that both parents had made good progress toward maintaining sobriety. Neither parent had relapsed into using drugs or alcohol, both parents completed their inpatient rehabilitation programs, and both parents were attending group sessions. Even the parents' progress in staying drug free, however, was not established over a significant period of time. Mother was only beginning the third step of her 12-step program and father was only in the first step of his program. Furthermore, mother had falsified a meeting slip and multiple witnesses testified about their concern that this could indicate mother was in danger of losing her sobriety.

Mother's progress in therapy and in understanding what motivated her to burn her daughter remained highly questionable. The court found that mother's testimony lacked credibility. Several witnesses testified that mother was manipulative and the trial court found this true. Mother told inconsistent versions over time of how A.G. came to be burned. Although, in March 2014, mother appeared to take responsibility for her conduct, admitting that she "did it" and burned A.G. intentionally, in later comments and during her review hearing testimony, mother refused to admit that she intentionally burned A.G. A.G. was sent to U.C. Davis Medical Center to treat her burns. In a criminal action, however, mother pled guilty to a felony count of inflicting physical pain on A.G pursuant to Penal Code section 273a, subdivision (a), and admitted an enhancement that she committed great bodily injury on A.G. pursuant to Penal Code section 12022.7, subdivision (d). Mother also denied or minimized other injuries that she inflicted on A.G., including throwing A.G. in her crib and bruising A.G. on other occasions.

Where a parent fails to admit that he or she inflicted physical or emotional abuse on a child, the efficacy of therapeutic help from a therapist may be minimal. (*In re Jessica B*. (1989) 207 Cal.App.3d 504, 516-517 (*Jessica B*.).) Mother began the mental health evaluation and therapy process relatively late. Her own therapist was concerned that mother was manipulative. Given the testimony and evidence before it, the juvenile

court had substantial evidence that mother had not progressed significantly in her therapy and that additional psychological services would not make it possible for mother to reunify with the children within a year.

Mother was also in the early stages of classes to address her domestic violence issues, which affected A.G. *and* father. Mother only started those services in June 2014, and was about nine weeks into a 52-week program that she would not finish until well after the children would have been dependents past one year. Mother's violence was a primary factor at the root of the dependency action.[7]

Father's progress in understanding how to parent, the issues surrounding mother's domestic violence, and his ability to protect the children was called into question by social workers. Father was usually not with the children when mother was abusive and when father saw bruises and injuries on A.G., he failed to ask mother what happened to A.G. Father failed to intervene during the episode where A.G. was screaming and crying while mother held her stiff armed for 40 minutes during a parental visit. Father testified at the hearing that he still did not believe mother could have harmed A.G. Father is in a similar state of denial as mother concerning what happened to A.G. The holding of

---

**7** Related to mother's substantial evidence contention is her argument that the court failed to consider the substantial probability that the children would be returned to her custody within 12 months. The court specifically found there was not a substantial probability that the children would be returned to either parent within 12 months. Mother's argument is based on the fact that the juvenile court permitted her to continue to receive services for the infant child. Mother argues that the court contradicted itself in not permitting her further services for A.G. and V.G. as well. We agree with respondent that given mother's abusive history with A.G., her relationship with the older children was on a different track with the newborn. For instance, during one visitation, both parents appeared to be overwhelmed at caring for A.G., V.G., and their infant sibling. The parents may have a better chance to reunify with a single infant child. We do not find the juvenile court's rulings as to the infant sibling inconsistent and reject this contention.

*Jessica B.* is equally applicable to father as it is to mother. Father had gained little of the necessary insight in to how to care for, or to protect, his children.

There was substantial evidence before the trial court that the parents failed to progress with the services they were provided. The evidence adduced at the hearing did not show that either parent would be likely to reunify with A.G. and V.G. a year after the detention even if additional reunification services had been provided.

### *Reasonable Services*

Mother and father contend they were not provided with reasonable services. Mother argues that it took two months for her to receive initial services and the social worker was biased against her.

Father argues that his counselors testified that he needed assertiveness training, individual counseling, and co-dependence counseling. Respondent notes father does not argue that he failed to get the services identified in his reunification plan, but instead asserts the plan itself was inadequate. Respondent contends that father had responsibility to seek those further services he believed were missing from his plan and failed to do so in a timely fashion. We agree with respondent.

As a preliminary matter, we initially find that neither parent challenged the reunification plan as ordered by the juvenile court. Neither parent appealed the juvenile court's rulings after the disposition hearing. In failing to do so, the parents have waived any complaint they may have regarding the plan as ordered after reunification services are terminated. (*In re Julie M*. (1999) 69 Cal.App.4th 41, 46-47; *John F. v. Superior Court* (1996) 43 Cal.App.4th 400, 404-406.) Mother continues to challenge the implementation of the plan and father continues to challenge the adequacy of the plan.

The department and the juvenile court are required to tailor a reunification plan to accommodate a parent's special problems or limitations. If the parent feels he or she requires further services or the services provided are inadequate, and the parent is represented by counsel to assist in formulating a better plan, the party has the duty of

27

looking after his or her legal rights and calling attention to the court of any infringement of those rights. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416 (*Christina L.*).)

A parent's emotional issues do not excuse him or her from a failure to participate in a reunification plan. Some capacity to achieve the reunification goals is presumed. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762; *Christina L.*, supra, 3 Cal.App.4th at p. 415.) The standard is not whether the services were the best that might be provided in an ideal world, rather, it is whether the services were reasonable under the circumstances. (*Elijah R.*, *supra*, 66 Cal.App.4th at p. 969; *Misako R.*, *supra*, 2 Cal.App.4th at p. 547.)

Mother's argument rests primarily on the conflict she had with social worker Pamela Werb. Mother's petition states that Werb inaccurately stated in a report written for the review hearing that the family came to the attention of the agency due to non-accidental harm. Mother's writ petition challenges the veracity of this statement because there were no allegations of non-accidental harm in the original dependency petition and the juvenile court did not make a finding based on intentional harm.

We initially note that mother admitted at the jurisdiction hearing the allegations that her daughter suffered a facial burn and mother's explanation was not plausible. The social worker's report noted that mother was arrested for her actions and resolved her criminal case.[8] Mother admitted the allegations in the social worker's report. Mother admitted allegations made by father in the dependency petition that she threw A.G. in her crib for extended periods of time when both children were crying and mother was mean to A.G. The petition set forth, and mother also admitted that (1) A.G. suffered head trauma in addition to her burns; (2) A.G. was found unconscious; (3) mother left A.G. unattended and A.G. suffered injuries as a result; (4) mother did not change the children's

---

[8]    Mother was in custody on the criminal charges for about two weeks after the children were detained. Mother's incarceration was not of long duration and does not appear to have caused any substantial delay in her ability to seek or to obtain services.

diapers; and (5) mother's version of events was not consistent with A.G.'s observed injuries.[9] We reject mother's contention that because there were no allegations in the petition that mother intentionally burned A.G., or was the direct cause of harm to A.G., that Werb misrepresented mother's legal status.

We further reject mother's contention that the juvenile court could not rely on her criminal conviction and her later admission of intentionally inflicting injury to A.G. because it did not originally make a jurisdictional finding based on mother's intentional conduct. Mother's argument misses the point. A jurisdictional finding by a court gives the court jurisdiction to detain minors and to order services for the parents. Such findings do not freeze the case in time or limit the ability of the juvenile court, based on new evidence, to evaluate that new evidence and to order or limit further reunification services to the parents.

Mother's further contention that her services were delayed is also unsupported in the record. Mother herself caused delays in receiving a mental health assessment, claiming for instance that she could not take anxiety medications during her pregnancy. With or without medication, however, mother could have obtained the assessment. Werb eventually helped mother obtain an appointment for assessment and the assessment was made, though late in the process. Mother also delayed initiation of her personal counseling sessions and domestic violence classes. The record establishes that mother received referrals for all of these services during or shortly after the detention hearing and

---

[9]     The social worker's reports also refuted one allegation in the original petition that A.G.'s swollen vagina was potentially due to insertion of a foreign object. Later evidence, according to the social worker's reports, indicated that this condition was due to A.G.'s diaper rash. Clearly we do not consider this allegation in the dependency petition as established even though mother submitted to the jurisdiction findings on the petition and the reports. The social worker's supplemental report also established the fact of mother's criminal conviction for child abuse. This fact was established by mother's submission of the jurisdiction findings on the supplemental report.

that many, if not all, of the delays in obtaining services were caused by mother, not by Werb, the agency, or other service providers.

As respondent observes, father apparently had a literacy issue. This problem delayed his completion of inpatient drug treatment and he was readmitted into the program and given a friend to help him take notes. Father brought notes from other services he received to court with him for referral during the hearing. The agency was aware of father's literacy issue, and found accommodations to help him. There is no other indication in the record, however, that father suffered other disabilities which affected his ability to reunify with his children.

Father was on notice from the time the juvenile court sustained the petition at the detention hearing that A.G. suffered physical harm caused by mother and he had failed to keep her safe even though father had himself witnessed some of this harm. At the outset of the dependency proceedings, father indicated that he did not believe the harm caused to his daughter was his responsibility. Father testified at the hearing, nearly nine months after the proceedings began that he did not believe mother could have injured A.G.

We agree with respondent's point that father was on fair notice that he would have to demonstrate a capacity to protect his children from physical abuse and failed to do so during his testimony at the hearing. The relationship between father and mother was intact. Counselors and social workers testified that father was informed directly and through the services he received that he would have to be able to protect the children from mother if she again became abusive. Throughout the proceedings, however, father appeared to be a passive observer of events rather than an actively involved parent.

Father received counseling, parenting, domestic violence prevention and other services. If the services provided to father failed to meet father's needs, father had some responsibility to seek a modification of his reunification plan. He never did so. In light of the services offered to father, his failure to win back his children indicates a lack of

30

interest or capacity rather than inadequacy of the services offered. (*In re Laura F*. (1983) 33 Cal.3d 826, 839.)

### *Mother's Factual and Due Process Contentions*

Mother reiterates her argument that she did not admit to the social worker that she threw scalding water on her daughter's face. Mother also argues that the juvenile court's reference to A.G. being scared of mother was improper. Mother contends she was denied due process because of the juvenile court's rulings. We disagree.

Mother states in her writ petition that there was no finding by the juvenile court pursuant to section 300, subdivision (a), establishing mother presented a future risk of harm to A.G. and V.G. She also argues there was no finding by the court pursuant to section 300, subdivision (c), of serious emotional damage. Mother contends that the absence of findings by the juvenile court of a substantial risk of future injury or serious emotional damage denied her due process because these issues did not arise until the review hearing.

As we explained above, the purpose of a jurisdiction finding is for the court to have jurisdiction to detain minors and to order reunification services for the minors' parents. Even if we assume mother did not admit during the jurisdiction/disposition hearing that she intentionally harmed A.G., we find no due process violation in the instant action. The allegations of dependency petition clearly showed A.G. had been physically abused and mother had no satisfactory explanation for how the injuries occurred.

As a matter of due process, mother was charged, and admitted, criminal felony allegations that she physically abused and harmed A.G. and caused A.G. great bodily injury. Mother was well aware from the outset of these proceedings that her physical abuse of A.G. and domestic violence issues were the focus of concern for the agency and the focus of services ordered for her. As this action progressed, mother admitted to service providers that she harmed A.G. intentionally, and later recanted this admission.

31

The juvenile court had an obligation to consider whether mother was progressing in her plan. Mother's ability to acknowledge wrongdoing was relevant evidence on whether mother was progressing in her reunification plan. Mother's ability to establish a trusting and loving bond with A.G. was also relevant to whether mother was progressing in her plan. Mother was represented by counsel, received the social worker's reports, was aware of her criminal conviction, and was notified throughout the process of her progress, or lack of progress, in implementing her reunification plan.

The social worker did not misrepresent the relevant facts of this case and the juvenile court did not violate mother's due process rights when it made factual findings concerning mother's lack of progress toward implementing her reunification plan. In doing so, the juvenile court could rely on evidence of mother's intentional criminal conduct, A.G.'s fear of mother, and the observations of service providers that mother was manipulative.

What mother attempts to characterize as new facts are not at all new and are the gravamen of the dependency petition. Where, as here, new details involving those facts are revealed during the dependency proceeding, the department is not required to file a new petition pursuant to section 342. (*In re Rodger H*. (1991) 228 Cal.App.3d 1174, 1183-1184.) What mother describes as new facts are actually details tending to explain the conduct alleged in the petition. (*Ibid*.) Mother was given fair notice of the factual allegations that established this dependency action. We find mother's due process arguments meritless.

Most of mother's factual contentions, including her assertions of bias by her social worker, the absence of evidence that she acted intentionally when she harmed A.G., and A.G.'s fear of mother, amount to a request for this court to reweigh the evidence. As we explained above, reviewing courts do not reweigh the evidence. (*Stephanie M*., *supra*, 7 Cal.4th at p. 318.)

32

**DISPOSITION**

The parents' petitions for extraordinary writ relief are denied.  This opinion is final forthwith as to this court.